**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JACOB MOSKOWITZ**, <br><br> Plaintiff, <br><br> v. <br><br> **THE STATE OF NEW JERSEY,** *et al.*, <br><br> Defendants. | Civil Action No. 19-12489 (ZNQ) (JBD) <br><br> **OPINION** |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants Rutgers, The State University of New Jersey, John Brennan, Anna Kornienko, Lydia Haynes, Peter Skeels and Patrick McDermott ("Defendants"). (ECF No. 85.) Defendants filed a Memorandum of Law in Support of the Motion (ECF No. 85-1, "Moving Br."). Plaintiff Jacob Moskowitz ("Plaintiff") filed a Brief in Opposition to the Motion (ECF No. 97, "Opp. Br.") and Defendants replied (ECF No. 98.)

    The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Defendants' Motion to Dismiss.

1

I.     **BACKGROUND AND PROCEDURAL HISTORY**[1]

Plaintiff was employed as a scientific glassblower in the Department of Chemistry and Chemical Biology at Rutgers University ("Rutgers Chemistry Department") from March 2016 to May 2018. (ECF No. 74, Amended Complaint ("Am. Cmpl.") ¶¶ 17, 26.) Over the course of his employment as a glassblower, Plaintiff alleges that he was exposed to three unknown "Experimental Thorium Compounds" ("ETCs") each of which contained a combination of chemicals involving thorium and numerous other hazardous and toxic chemical compounds ("Hazardous/Toxic Materials"), including Mercury, Hexane and Selenium (collectively, "Neurotoxins".) (*Id.* ¶¶ 15, 28.)

Starting in November 2016 until his termination in May 2018, Plaintiff was asked by Defendants to handle various chemicals, including the ETCs, through his work sealing, cleaning, and repairing contaminated flasks and other types of scientific glassware. (*Id.* ¶¶ 64, 65.) Plaintiff performed such work unaware that he was handling ETCs and did so without necessary safety requirements or protections required when handling Hazardous/Toxic Materials. (*Id.* ¶¶ 20–24, 26.) Plaintiff alleges that Defendants did not disclose to him the composition of the chemical compounds in the experimental samples he was asked to work with, nor that such chemical compounds were hazardous. (*Id.* ¶ 73.) As an artistic glassblower, Plaintiff also alleges he lacked prior training and expertise with how to handle Hazardous/Toxic Materials. (*Id.* ¶¶ 17–18.)

In September 2017, Plaintiff suffered two epileptic seizures requiring hospitalization and medical treatment, which the Amended Complaint attributes to his exposure to the experimental Thorium compounds. (Am. Cmpl. ¶¶ 14, 27, 80–87.) Specifically, however, Plaintiff alleges that

---

[1] For the purposes of this Motion to Dismiss, the Court "accept[s] as true all factual allegations in the [Amended Complaint] and draw[s] all inferences from the facts alleged in the light most favorable to [Plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003)). .

2

it was not the thorium in the ETCs that caused him to suffer epileptic seizures and other dangerous effects. (*Id.* ¶ 14.) He alleges that discovery in this case shows that the thorium metal Defendants used in their experimental research was "entirely consumed by a chain of chemical reactions" before the experimental material was provided to him for the purpose of sealing it in quartz vials. (*Id.* ¶ 16.)

In April 2018, Plaintiff reported his workplace safety concerns to the University. (*Id.* ¶ 90.) These concerns were investigated by Rutgers Environmental Health Services ("REHS"), culminating in an investigation report, dated April 19, 2018, that recommended implementing various safety procedures ("REHS Report"). (*Id.* ¶¶ 93-106.)

On April 27, 2018, Plaintiff was informed that his employment was being terminated effective May 11, 2018. (*Id.* ¶ 124.) Following Plaintiff's termination, he submitted a complaint to the Rutgers Office of Employment Equity ("OEE"), alleging that he was terminated in retaliation for raising safety concerns about the handling of Hazardous/Toxic Materials in violation of the Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1 *et seq.* ("CEPA"). (*Id.* ¶¶ 125–127.) OEE conducted an investigation and memorialized its findings in a report dated August 2, 2018 ("OEE Report"). (*Id.* ¶¶ 129–41; ECF No. 1-3, Complaint, Ex. A, OEE Report.) The OEE Report concluded that, "[u]nder the preponderance of the evidence standard, it seems more likely than not that [Plaintiff's] safety complaints triggered his termination." (OEE Report at 11.)

Plaintiff initiated this lawsuit by filing the Complaint on May 10, 2019. (ECF No. 1.) On May 14, 2021, Defendants filed a Motion to Dismiss the Complaint, predicated on the application of the federal Price-Anderson Act, 42 U.S.C. §§ 2011, *et seq.* ("PAA"), which Defendants argue preempts Plaintiff's claims because they relate to injuries arising out of a "nuclear incident." (ECF

3

No. 62-1.) In response to Defendants' motion, Plaintiff sought leave to amend the Complaint "in a manner that removes it entirely from the PAA's scope." (ECF No. 69 at 2.) On November 5, 2021, Plaintiff was granted leave to file an Amended Complaint, (ECF No. 73), which Plaintiff did on November 14, 2021 (ECF No. 74.)

The Amended Complaint asserts nine claims on the following bases: 42 U.S.C. § 1983 (Count One); (2) Substantive Due Process (Count Two); (3) Strict Liability (Count Three); (4) Negligence (Count Four); (5) Battery (Count Five); (6) Breach of Contract (Count Six); (7) Fraud (Count Seven); (8) CEPA (Count Eight);[2] and (9) Vicarious Liability (Count Nine). (*Id.* ¶¶ 149-190.) The instant motion ensued. (ECF No. 85.)

## II.  **LEGAL STANDARD**

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286 (citations omitted). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235–36 (3d ed. 2004)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when

---

[2] Plaintiff's claim under CEPA is mistakenly numbered as a second Count Seven in the Amended Complaint. (Am. Cmpl. ¶¶ 184–188.) The Court will refer to it as Count Eight.

4

the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "further factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286 (citations omitted).

### III.   DISCUSSION

In their motion to dismiss, Defendants raise three broad arguments for dismissal of Plaintiff's claims in the Amended Complaint. First, they contend that the PAA preempts all of Plaintiff's claims. Second, they argue that the New Jersey Workers' Compensation Act bars Plaintiff's state-law claims based on strict liability (Count Three), negligence (Count Four), battery (Count Five), breach of contract (Count Six), fraud (Count Seven), and vicarious liability (Count Nine). Third, Defendants contend that Plaintiff's due process claims under 42 U.S.C. § 1983

5

(Counts One and Two), and his state-law claims for breach of contract (Count Six), fraud (Count Seven), and vicarious liability (Count Nine) fail to state plausible claims. The Court first considers Defendants' arguments based on the PAA.

Congress passed the Price-Anderson Act in 1957 as an amendment to the Atomic Energy Act to "protect the public and to encourage the development of the atomic energy industry." Pub. L. No. 85-256, § 1, 71 Stat. 576 (1957). Over time, the scope of the PAA was expanded by Congress in successive amendments. Relevant to this case, an amendment in 1988 gave federal courts original jurisdiction over "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. §§ 2210(n)(2). As the Third Circuit has observed, this transformed the entire landscape by creating a federal cause of action, which did not exist prior, for "any legal liability of any person who may be liable on account of a nuclear incident." *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 854 (3d Cir. 1991); *see also Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) ("Congress intended to create an exclusive federal cause of action for torts arising out of nuclear incidents.").

Consequently, a plaintiff who asserts any claim arising out of a "nuclear incident" as defined in the PAA, 42 U.S.C. § 2014(q), "can sue under the [PAA] or not at all." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir. 1997); *see also Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 193 (5th Cir. 2011) (stating that if plaintiffs' state law claims constitute a "public liability action arising out of or resulting from a nuclear incident," such claims must be brought pursuant to the PAA.) Under the PAA, "a state cause of action is not merely transferred to federal court; instead a new federal cause of action supplants the prior state cause of action" because the Amendments Act created an "overlay of federal law upon the rights and remedies previously available under state law." *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1099–1100,

1101 (7th Cir. 1994); *see also In re TMI*, 940 F.2d at 855 ("Congress expressed its intention that state law provides the content of and operates as federal law [under the PAA scheme.]")  In other words, "[h]is federal claim will be derived from state law," *Nieman*, 108 F.3d at 1553, "unless such law is inconsistent with the provisions of [§ 2210]," 42 U.S.C. § 2014(hh).

Here, Defendants argue that the "gravamen of plaintiff's putative causes of action is an alleged exposure to harmful radioactive, toxic or other properties of thorium and/or thorium compounds."  (Moving Br. at 2.)  In a similar vein, Defendants contend that "[i]t cannot be contested that the Complaint—from the factual allegations and through all nine counts—alleges an occurrence of 'bodily injury, sickness and disease' (epilepsy) 'arising out of or resulting from' exposure to 'a combination of three unknown experimental compounds involving Thorium'– which is a source material—"and numerous other hazardous and toxic chemical compounds (collectively, the Hazardous/Toxic Materials) including Mercury, Hexane and Selenium (collectively, the Neurotoxins)."  (Moving Br. at 17) (quoting Compl. ¶ 28) (some interior quotation marks omitted).  Accordingly, Defendants argue that Plaintiff's claims are preempted by the PAA and, because Plaintiff refuses to proceed under the PAA, his claims should be dismissed. (Moving Br. at 8.)

Plaintiff, however, maintains that his claims should not be dismissed because his injuries did not arise out of a nuclear incident.  He argues that his Amended Complaint now alleges that he was actually injured by exposure to the mercury and hexanes also present in the glassware he was

required to work with, not the thorium. (Opp. Br. at 3.) In the alternative, he contends that the three ETCs do not constitute source material within the meaning of the PAA. (*Id*. at 3–5.)[3]

Under the well-pleaded-complaint rule, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 407 (3d Cir. 2021). The PAA is an exception to this rule, because it contains "an unusual pre-emption provision . . . that not only gives federal courts jurisdiction over tort actions arising out of nuclear incidents but also expressly provides for removal of such actions brought in state court even when they assert only state law claims." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 6 (2003) (citation omitted). By virtue of this provision, Congress "expressed an unmistakable preference for a federal forum." *El Paso Nat. Gas v. Neztsosie*, 526 U.S. 473, 484 (1999). The effect is that the PAA "transforms into a federal action any public liability action arising out of or resulting from a nuclear incident." *Id*. (quoting § 2210(n)(2)) (interior quotation marks omitted).

A "nuclear incident" is defined by the PAA as follows:

> [A]ny occurrence . . . causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material[.]

42 U.S.C. § 2014(q). Relatively recently, the Third Circuit affirmed that a university researcher's death by exposure to source material in a laboratory setting falls within the scope of a nuclear

---

[3] Plaintiff briefly raises another legal argument in his opposition to the motion. He contends the motion should be denied because Defendants are licensed by the State to use thorium in their research under an agreement between the State and the federal Nuclear Regulatory Commission. (Moving Br. at 6.) To the extent Plaintiff believes Rutgers' state-issued license might somehow bring its activities outside the purview of the PAA, the Third Circuit has already considered and rejected this argument. *Estate of Ware*, 871 F.3d at 284 ("We thus reject the argument that UPenn's state-issued license is meaningfully different in this context from a license issued directly from the NRC. As a result, even if [plaintiff] is correct that possession of a license is a lynchpin for Price-Anderson's applicability, UPenn's license would satisfy that requirement.")

incident. *Estate of Ware v. Hospital of Univ. of Penn.*, 871 F.3d 273, 280 (3d Cir. 2017) (observing that the peculiarity of what constitutes a nuclear incident "derives from Congress' slow expansion of the [PAA]'s statutory definitions to bring a growing set of matters within its scope.")

The parties in this case do not seem to dispute that the PAA provides the sole federal cause of action when a nuclear incident is asserted. Instead, they disagree as to whether, factually speaking, a nuclear incident has even been alleged.

The Amended Complaint now alleges that it was not thorium that caused Plaintiff's "epileptic seizures and other dangerous effects." (Am. Cmpl. ¶ 14) According to Plaintiff, discovery in the case has since shown that there were "only trace amounts of Thorium" in the ETCs and the trace amounts were "combined with copious amounts of hazardous and toxic chemicals and chemical compounds . . . including three potent neurotoxins: Mercury, Hexane and Selenium." (*Id*. ¶ 15.) He claims his injuries were caused by these non-Thorium Hazardous/Toxic Materials and Neurotoxins in the experimental chemical compounds, rather than the Thorium itself. He alleges the Thorium was entirely "consumed by a chain of chemical reactions" before Plaintiff received Defendants' "mysterious powder samples." (*Id*. ¶ 16.)

Perhaps most succinctly, the Amended Complaint alleges in Count One that "Defendants are liable . . . for the unlawful and/or reckless assault on Mr. Moskowitz . . . *by exposing him to Hazardous/Toxic Materials, including Neurotoxins in the experimental Thorium compounds they produced* [under a] National Science Foundation grant." (*Id*. ¶ 150) (emphasis added.) The Amended Complaint incorporates this allegation into Plaintiff's remaining claims.

First, despite Plaintiff's arguments to the contrary, thorium is considered a source material regardless of its isotopic state. 42 U.S.C. § 2014(z); 10 C.F.R. § 40.22 (regulating receipt, possession, use and transfer of thorium in its "natural isotopic concentrations" for purposes that

9

include research, development, and education at research and educational institutions.) Likewise, compounds that contain thorium also qualify as source materials. *See* § 40.22(a) (requiring source material licensees to account for chemically or physically altered forms of materials that themselves contain source material). The Court therefore finds that, as a matter of law, Defendants' ETCs qualify as source materials within the meaning of the PAA.

Beyond emphatically asserting—in what might be construed as a results-oriented effort—that thorium is *not* the cause of Plaintiff's injuries, the Amended Complaint is less than clear as to what he believes *did* cause him harm.[4]

To the extent the Amended Complaint alleges injury from Plaintiff's exposure to the ETCs, this constitutes a "nuclear incident" under the PAA even if Plaintiff does not believe radiation is the cause of his injuries. As set forth above, the scope of what constitutes a nuclear incident explicitly encompasses any injuries resulting from "toxic" or "other hazardous properties" of a source material. To the extent the Amended Complaint alleges injury due to Plaintiff's exposure to residual mercury, hexane, or selenium (or compounds containing them)—that were used by Defendants to synthesize experimental Thorium Compounds—the Court likewise finds that Plaintiff's exposure to them also constitutes a "nuclear incident" because Plaintiff's exposure "arose" directly from Defendants' efforts to synthesize the source material. Thus, Plaintiff's attempts to avoid the application of the PAA in this case by pointing to mercury, hexane, and selenium cannot succeed, at least at this stage of the proceedings.

---

[4] While the Amended Complaint may not be a model of clarity, the Court does not fault Plaintiff entirely. First, given the nature of the relationship between the parties, the technical information he needs is not in his possession. Second, given the nature of the university research work involved, the materials and processes may not have been thoroughly characterized. It is entirely possible therefore that the technical information provided to Plaintiff was incomplete. Third, any such technical information that Defendants made available to Plaintiff was undoubtedly difficult to parse.

Based on the foregoing, the Court will grant the portion of Defendants' motion seeking to dismiss the Amended Complaint. The dismissal will be without prejudice to Plaintiff's right to file a Second Amended Complaint alleging claims under the PAA. Given the Court's decision based on the PAA, it does not reach Defendant's remaining arguments.

The Court notes that its conclusion on this motion may be fatal to Plaintiff's attempts to plead state law causes of action, but not fatal to his case. He may pursue his claims as federal claims under the PAA. Moreover, "[e]xcept to the extent that a provision of the [PAA] requires something different," state law will provide the elements of those claims. *Estate of Ware*, 871 F.3d at 280 n.5.

## IV. CONCLUSION

For the reasons stated above, the Court will GRANT Defendants' motion to dismiss, and dismiss the Amended Complaint without prejudice. Plaintiff will be granted leave to file a Second Amended Complaint consistent with this Opinion within thirty days. An appropriate Order will follow.

Date: **April 18, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
